UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY TROST,

        Plaintiff,

                                           Case No. 1:09-cv-580
v.                                            Hon. Hugh W. Brenneman, Jr.

ZACHARY TROST, *et al.*,

        Defendants.

_____/

**OPINION**

This matter is now before the court on defendants' motion for summary judgment (docket no. 33).

**I.      Background**

**A.     Allegations in the amended complaint**

Plaintiff Sherry Trost is the widow of Fred D. Trost ( "Fred Trost").  This action seeks damages and injunctive relief arising from Fred Trost's business ventures, which included a long-running television show.  Plaintiff filed this action in the federal court on June 24, 2009.  *See* Compl. (docket  no. 1).  She filed an amended complaint on December 16, 2009, which named 32 defendants: Zachary Trost (Fred Trost's son); Zachary's wife, Kim Trost; "John and Jane Does I-X;" "ABC Partnerships I-X;" and XYZ Corporations I-X."  *See* Amend. Compl. (docket no. 17).

Plaintiff set forth the following allegations in her amended complaint.  Fred Trost started a television show in Michigan in 1982, entitled *Michigan Outdoors* (sometimes referred to as "the show"), which "was a dba of Michigan Sportsman Development Association."   Amend.

Compl. at ¶¶ 6-7.[1]  Plaintiff married Fred Trost in 1988.  *Id.* at ¶ 8.  In 1992, the "Michigan

Sportsman Development Association became Practical Sportsman, Inc."  *Id.* at ¶ 9.  "*Michigan*

*Outdoors*" and the "Practical Sportsman, Inc." accumulated significant debts, including a civil

judgment. *Id.* at ¶ 10.[2]  Fred Trost was going to shut down the television show and the business

because of the debt.  *Id.* at ¶ 11.

Plaintiff and non-party JoAnn Cribley ("Cribley") "agreed to take ownership of the

show and its assets and agreed to take on the show's debts in their names so that Fred Trost could

continue to operate the show."  *Id.* at ¶ 13.  On May 1, 1996, Cribley filed a certificate of assumed

name with the State of Michigan, "assuming, on behalf of ZNT Marketing, Inc., the name Practical

---

[1] The court notes that the amended complaint sometimes refers to the television show as a separate entity, rather than as an assumed name of the corporation.

[2] The underlying facts of this judgment (sometimes referred to as the "Buck Stop [sic]" judgment), were set forth by the bankruptcy court as follows:

> The Debtor and Defendant in this case, Fred D. Trost, is a well-known, successful television and publication personality in Michigan.  Until he filed Chapter 7 in 1992, he published a magazine called "Fred Trost's Michigan Outdoors" and produced a television show by the same name.  Both the magazine and the television show were generated by Fred Trost Enterprises, Inc. (FTE), a corporation of which he was the sole shareholder.

> Plaintiff Buckstop Lure Company, Inc., produces hunting scent products.  Mr. Trost utilized his access to the public to disparage Plaintiff and its product. Specifically, Defendant claimed that the scents sold by Plaintiff, although advertised as containing deer urine, actually contained cow urine.  Plaintiff instituted an action for defamation against Defendants Fred Trost and FTE in Montcalm County Circuit Court.  On February 7, 1992, the jury returned a remarkable $4 million verdict against both Defendants.

*In re Trost*, 164 B.R. 740, 741 (Bkrtcy. W.D. Mich. 1994).  Fred D. Trost filed a Chapter 7 bankruptcy action and on January 6, 1993, the bankruptcy court granted him a discharge.  *Id.*  However, the bankruptcy court later granted BuckStop Lure Company the "exceptional remedy" of revoking Trost's discharge after finding by a preponderance of the evidence that Trost "fraudulently listed the transfer of FTE stock on his schedules in an attempt to keep control of the stock from [BuckStop Lure Company] and rival MUCC ["Michigan United Conservation Club"]" and that he engaged in "a calculated pattern of deception designed to mislead the Court and manipulate the bankruptcy process for the debtor's own benefit to the detriment of his creditors."  *Id.* at 749.

Sportsman, Inc." *Id.* at ¶ 14.[3]  Plaintiff and Cribley became officers and owners of "Practical

Sportsman, Inc." *Id.* at ¶ 15.  In turn, Fred Trost promised to repay "any and all debts of the show"

as soon as he received an expected inheritance from his parents. *Id.* at ¶¶  12 and 16.

In 2002, a non-profit corporation known as  the "Practical Sportsman Foundation"

(the "Foundation") was established to continue the operation of the television show. *Id.* at ¶ 17.

Plaintiff and Cribley were officers of the foundation, which both took on the debts of "the previous

business entities" and incurred additional debt. *Id.* at ¶¶ 18-19.  Fred D. Trost remained in charge

of running "the business," including finances and bookkeeping, and again promised to repay the

debts of the show as soon as he received the expected inheritance. *Id.* at ¶¶ 20-22.

The  Foundation obtained an operating loan in the amount of $36,000.00, using the

"rights to episodes of the show" as collateral. *Id.* at ¶ 23.  The Foundation also incurred significant

tax debts to the Internal Revenue Service (IRS) and the State of Michigan which, at the time plaintiff

filed the amended complaint, were in the amounts of approximately $56,707.06 and $16,000.00,

respectively. *Id.* at ¶¶  24-25.  Plaintiff alleged that she and Cribley are "ultimately liable" for the

loan and tax debts as the "legal owners and financiers" of the Foundation. *Id.* at ¶ 26.  Fred Trost

became ill in May 2007 and died of natural causes in July 2007. *Id.* at ¶¶ 28-29.  He did not leave

a last will and testament, but had "repeatedly expressed his desire to put down in writing his promise

to pay the debts of the business so [p]laintiff would not be liable." *Id.* at ¶ 29.

Fred Trost's son, defendant Zachary Trost, worked on the show. *Id.* at ¶¶ 31-32.

Plaintiff alleged that Zachary Trost was "fully aware of the arrangement pursuant to which Fred

---

[3] In their affidavits, Sherry Trost and Cribley identify "ZNT Marketing, Inc." as a corporation owned by defendant Zachary Trost. *See* discussion in §§ I.B. and I.C., *infra*.

3

Trost promised to pay any and all debts of the business with his inheritance," and "that [p]laintiff had signed for the business in order to allow Fred Trost to carry on his legacy and dream." *Id.* at ¶¶ 33-34. Plaintiff owned all of the property related to the show, including "all original episodes and the rights thereto." *Id.* at ¶ 36 (emphasis omitted). However, Zachary Trost "wanted the personal property related to the legacy of the show and Fred Trost." *Id.* at ¶ 35 (emphasis omitted).

When Fred Trost died, plaintiff and Zachary Trost agreed that plaintiff would give him "all of the business assets, which she rightfully owned as owner of the business and personal property she owned related to the show, business and Fred Trost's legacy," in consideration for Zachary Trost "paying the business debts, including the tax debts and outstanding loans with the inheritance Fred Trost was to have received." *Id.* at ¶ 37 (emphasis omitted). Pursuant to this agreement and Zachary Trost's "representations," plaintiff allowed Zachary and his sister, Tara Trost, to take possession of "all of the assets, original episodes and memorabilia of the show that belonged to [p]laintiff." *Id.* at ¶ 39 (emphasis omitted). Zachary Trost ultimately received the inheritance that his father, Fred Trost, had expected throughout his lifetime. *Id.* at ¶ 40.

Zachary Trost has attempted to sell and market the show's assets and "[p]laintiff's property" and has retained possession of both the show's assets and "[p]laintiff's property." *Id.* at ¶¶ 41-42 (emphasis omitted). Despite plaintiff's "demand," Zachary Trost has not paid any of the "show/business debts" and has refused to return plaintiff's "property." *Id.* at ¶¶ 43-44.

Based on these allegations, plaintiff's amended complaint seeks seven "claims for relief": (I) Breach of Contract; (II) Breach of Implied Covenants; (III) Fraud - Intentional Misrepresentation; (IV) Rescission; (V) Common Law Conversion; (VI) Statutory Conversion -

M.C.L. § 600.2919a; and (VII) Injunctive Relief.  Plaintiff seeks damages in the amount of $108,797.06, punitive damages and attorneys' fees.  In the alternative to monetary damages, plaintiff seeks to rescind the agreement between the parties and order "[d]efendant" to return to her "all property she transferred to him."  Finally, plaintiff seeks an order prohibiting "[d]efendant" from disposing any of plaintiff's property until conclusion of this litigation.

  **B.**  **Sherry Trost's affidavit**

    In response to the motion for summary judgment, plaintiff submitted an affidavit which is at times inconsistent with the allegations set forth in the amended complaint.  According to Sherry Trost, Fred Trost started a television show in 1982, entitled *Michigan Outdoors*.  Sherry Trost Aff. at ¶ 2 (docket no. 42-1).  *Michigan Outdoors* "was a dba of Fred Trost Enterprises, Inc." *Id.* at ¶ 3.[4]  Fred Trost Enterprises, Inc., incurred a significant debt, including a civil judgment commonly referred to as the "Buck Stop" judgment.  *Id.* at ¶ 5.  At a later date, *Michigan Outdoors* "was operated by the corporate entity Michigan Sportsman Development Association" and the name of the show was changed to *Practical Sportsman*.  Sherry Trost Aff. at ¶ 6.  In 1992, "Michigan Sportsman Development Association" became "Practical Sportsman, Inc."  *Id.* at ¶ 7.  "Practical Sportsman Inc. [sic] was later changed to a nonprofit corporation, Practical Sportsman Foundation." *Id.* at ¶ 8.

    When the assets of Fred Trost Enterprises, Inc., were "seized" due to the "Buck Stop" judgment, the "tape library" for the shows owned by Fred Trost Enterprises, Inc. was sold at an auction and purchased by ZNT Marketing, Inc., a corporation "at least partially owned" by

---

[4] As previously discussed, the amended complaint alleged that *Michigan Outdoors* was a dba of Michigan Sportsman Development Association.

defendant Zachary Trost. *Id.* at ¶ 9. The "tape library" was "signed over" to plaintiff when defendant Zachary Trost incurred substantial debt and "dissolved his business" which ran a museum. *Id.* at ¶ 10. In consideration for this transfer of the "tape library" to plaintiff, two entities, Michigan Sportsman Development Association and Practical Sportsman, Inc., "paid-off bills from [defendant Zachary Trost's] company." *Id.* at ¶ 10.

The debts from Fred Trost Enterprises, Inc. followed Fred Trost and "made it impossible for him to own or operate the show in his name or to own any assets of the show." *Id.* at ¶ 12. Under these circumstances, Fred Trost was going to have to "shut down the show and business" due to the debt. *Id.* at ¶ 13. At some point in time, plaintiff and Cribley became "officers and owners" of Practical Sportsman, Inc. *Id.* at ¶ 16.

In 2002, Practical Sportsman Foundation was set up in order to continue the operation of the show. *Id.* at ¶ 18. Plaintiff and Cribley "were officers" of the Foundation, which took on the debts of the "previous business entities" and incurred additional debt. *Id.* at ¶¶ 19-20. Fred Trost "promised to repay any and all debts of the show as soon as he received his inheritance" which Fred anticipated from his parents. *Id.* at ¶ 21. While affiant states that Fred Trost "remained in charge of running the business, including finances and bookkeeping," *id.* at ¶ 22, she does not explain the nature of "the business" engaged in by the Foundation.

Plaintiff took a second mortgage on her home so that the Foundation could obtain an operating loan in the amount of $36,000.00. *Id.* at ¶ 23.[5] The Foundation incurred at least $56,797.06 in payroll tax liability to the IRS. *Id.* at ¶ 24. Plaintiff paid the IRS tax liability and the

---

[5] Plaintiff does not present evidence or claim that the Foundation entered into a agreement to reimburse her for the loan secured by the second mortgage on her home.

second mortgage with her personal funds.  *Id.* at ¶ 25.  The Foundation also incurred tax liability to

the State of Michigan of approximately $16,000.00 and took out an additional operating loan of

$9,000.00.  *Id.* at ¶¶ 26-27.  Plaintiff stated that she and Cribley were "the legal owners and

financiers of Practical Sportsman Foundation" and ultimately liable for the loan and tax debts.  *Id.*

at ¶ 28.

Fred Trost became ill in May 2007 and passed away in July 2007 "prior to receiving

his inheritance or paying any of the debts from the show."  *Id.* at ¶¶ 29-30.  Plaintiff stated that she

"remained the lawful owner of all personal property related to the shows," which she described as

"all original episodes and rights thereto."  *Id.* at ¶¶ 31 and 35.  Plaintiff entered into an agreement

with defendant Zachary Trost which she described as follows:

> Prior to, at the time of and following the passing of Fred Trost, Defendant
> [i.e., Zachary Trost] and I had multiple discussions and we agreed that I would give
> Defendant  all of the business assets, and all personal property related to the show,
> business and Fred Trost's legacy, in consideration for Defendant paying the
> aforementioned business debts, including the tax debts and outstanding loans.

*Id.* at ¶ 36.  Defendant Kim Trost was a party to "some of those discussions."  *Id.* at ¶ 37.

Plaintiff also explained how defendants Zachary Trost and Kim Trost came into

possession of the property at issue in this lawsuit:

> 38.  Pursuant to the agreement with Defendant [Zachary Trost] and in
> reliance on Defendant's representations, I allowed Defendants to take
> possession of all of the assets, original episodes and memorabilia of
> the show that belonged to me.

> 39.  The property was taken from my home and from storage units to
> locations including Defendants' residence, with Defendants'
> knowledge.

> 40.  Defendant attempted to sell and market the show's assets and my
> property, including, but not limited to, posting videos I owned on
> YouTube.

7

41.     Defendant has retained possession of my property.

42.     Despite demand, Defendant has not paid me the agreed consideration and has not otherwise compensated me or paid any of the debts.

43.     In addition, and despite demand, Defendant has refused to return my property.

*Id.* at ¶¶ 38-43.

Plaintiff submitted copies of the following documents which reflect the loans and tax debts referenced in her affidavit.  On October 2, 2006, she executed a promissory note in favor Capitol National Bank in the principal amount of $37,826.97 payable over a term of three years. *See* Promissory Note (docket no. 42-2 at p. 2).  The record also includes a redacted copy of a letter from the IRS to plaintiff, dated April 1, 2009, which reflects a balance due on her account with the IRS in the amount of $56,797.06.  *See* IRS correspondence (April 1, 2009) (docket no. 42-2 at p. 6). This balance due includes taxes due, along with penalties and interest, for the following tax quarters: 12/31/2002; 3/31/2003; 6/30/2003; 9/30/2003; 12/31/2003; 3/31/2004; 6/30/2004; 9/30/2004; 12/31/2004; and 3/31/2005.  *Id.*  Plaintiff also provided a copy of a cashier's check drawn on her account, dated June 30, 2009, and payable to the United States Treasury in the amount of $54,494.16.  *See* Cashier's check (docket 42-2 at p. 9).

### C.     Joann Cribley's affidavit

Cribley has submitted an affidavit which is consistent with the facts as set forth by Sherry Trost.  Cribley stated that she knew or worked with Fred Trost for over 17 years, that she was an owner of the Foundation, and that she was involved in the Foundation's operations and the operations of "its predecessor companies involved in the television shows starring Fred Trost."

8

Cribley Aff. at ¶¶ 2-3 (docket no. 42-1).  Cribley's affidavit recounted the history of the business

debts and the ownership of the business assets as follows:

> 10.    The assets of Fred's shows were seized due to the Buck Stop Judgment.
>
> 11.    The tape library from Fred's shows was bought by ZNT Marketing, Inc., a company owned by Zachary Trost, at the auction held when all the assets were seized due to the judgment.
>
> 12.    Zachary Trost sold and signed over to Sherry Trost the tape library when he dissolved the business, which ran the museum, after he became so far in debt that he asked his dad to bail him out.
>
> 13.    Fred Trost agreed to do that as long as [Zachary] signed over his ownership of the tape library, and any other assets his company owned, to Sherry.
>
> 14.    From this time forward, Sherry Trost owned all the assets of Michigan Outdoors and Practical Sportsman television shows.
>
> 15.    Michigan Sportsman Development Association and Practical Sportsman[,] Inc. paid-off [sic] the bills from Zach's company.
>
> 16.    Sherry Trost and I agreed to take ownership of the show and its assets and agreed to take on the show's debts in our names until he [i.e., Fred Trost] received his inheritance so that Fred Trost could continue to operate the show.
>
> 17.    Sherry Trost and I became officers and owners of Practical Sportsman, Inc.
>
> 18.    Fred Trost promised to repay any and all debts of the show as soon as he received his inheritance.

Cribley Aff. at ¶¶ 10-18.

Cribley outlined the debts owed by the business as follows: Sherry Trost took a

second mortgage on her home so that Practical Sportsman Foundation could obtain an operating loan

in the amount of $36,000.00; the Foundation took an additional operating loan of $9,000.00; and

the Foundation incurred at least $56,797.06 in payroll tax liability to the IRS. *Id.* at ¶¶ 24-26.

Cribley stated that "[b]ecause Sherry Trost and I were the legal owners and financiers of Practical Sportsman Foundation, we were ultimately liable for the loan and tax debts." *Id.* at ¶ 27.

Cribley also stated in her affidavit: that "Sherry Trost remained the lawful owner of all of [sic] personal property related to the show;" that Zachary Trost "was fully aware of the arrangement pursuant to which Fred Trost promised to pay any and all debts of the business with his inheritance;" that she and Sherry Trost "signed for the business in order to allow Fred Trost to carry on his legacy and dream;" and that she "corresponded with Zachary and Kim Trost regularly about the agreement they made with Sherry Trost pursuant to which Zachary was to pay the aforementioned tax liabilities and loans." *Id.* at ¶¶ 30-33.

Finally, Cribley explained how Zachary Trost came to possess the property at issue:

35.    Sherry Trost and I allowed Defendants [i.e., Zachary Trost and Kim Trost] to take possession of all of the assets, original episodes and memorabilia of the show that belonged to Sherry Trost, including those that were in a storage unit I had been paying for.

36.    The property was taken from Sherry Trost's home and from storage units to locations, including Defendants' residence, with Defendants' knowledge.

*Id.* at ¶¶ 35-36.

### D.    Zachary Trost's deposition

In his deposition, Zachary Trost testified that he was an employee of the Foundation in 2002, 2003 and 2004, earning $25,000.00 a year.  Zachary Trost Dep. at pp. 17-18 (docket no. 42-1).  Zachary Trost testified that he never discussed the business debts with plaintiff before his father passed away.  *Id.* at p. 23.  While Cribley signed his paycheck, he did not know who was in charge of the business' bookkeeping and had no knowledge that plaintiff or Cribley were liable for the Foundation's business debts.  *Id.* at pp. 23-24.  He knew that the Foundation took out an

10

operating loan, but he did not know any details of the loan. *Id.* at p. 25. While Zachary Trost was aware that he had no reported Social Security income for the three years he worked for the Foundation, he did not know about the Foundation's tax liability. *Id.* at pp. 26 and 28. Furthermore, he had no knowledge about whether some of the show's episodes were put up as collateral to secure an operating loan. *Id.* at p. 28.

Fred Trost died without leaving a will or trust. *Id.* at p. 29. Prior to his death, Fred told Zachary that he wanted Zachary to have the "video library," by which he meant the tapes of the television show. *Id.* Zachary stated that he got the tapes and then threw them away in the garbage can. *Id.* at pp. 29-30. Zachary estimated that he received "a couple thousand" tapes. *Id.* at p. 30. He did not make copies before throwing the tapes away. *Id.* According to Zachary, his father owned the tapes and gave them to him. *Id.* at p. 31.

Zachary denied that he agreed to pay the debts of the television show. *Id.* at p. 36. When asked about the disposition of "the remaining physical property from the show," Zachary assumed that it was auctioned off in 2005 when the Foundation "went bankrupt." *Id.* at p. 37. Zachary stated that before the bankruptcy sale, he moved the tapes out of a storage unit. *Id.* at p. 38. He took some of the tapes to his house and others "went into the landfill." *Id.* at pp. 38-39. Out of the thousands of tapes from the show, Zachary stated that he had "a couple hundred" at his house. *Id.* at p. 39. Zachary stated that he has not tried to sell or market the tapes and has not profited from them. *Id.* at p. 43. However, he did make a few copies of tapes as requested by Cribley. *Id.* at pp. 49-50.

Zachary did not recall receiving an email from plaintiff, dated November 1, 2008, in which plaintiff offered to sell him the tapes for $175,000.00. *Id.* at p. 47. When asked about the

11

value of the tapes, he stated that the tapes did not have this kind of value. *Id.* Zachary testified that he did not know who owned the rights to the television show. *Id.* at p. 51. When confronted with an e-mail from June 18, 2008, in which he offered to make dubs (copies) of the show tapes and "use some of the revenue to help the cause," Zachary denied that he was assisting plaintiff in paying down the Foundation's business debts. *Id.* at pp. 53-54. Rather, he could not identify "the cause" he referred to in the e-mail and his testimony consisted of vague responses ("[i]t could have been my own cause," "I don't know," "it was becoming apparent that there was some misunderstanding here," and "[w]e needed to get some stuff straight"). *Id.* at p. 54. Zachary admitted that he posted episodes of the show from the video library on YouTube. *Id.* at p. 55. Finally, Zachary testified that for his "own protection," he paid the attorney who met with Sherry Trost and Cribley about the tax debt owed to the IRS. *Id.* at p. 60.

### E.    Zachary Trost's e-mail correspondence

E-mails from Zachary Trost reflect coordination between himself, Sherry Trost and Cribley to address the business' financial issues: 6/18/2008 e-mail to Cribley (referring to "the website"); 6/23/2008 e-mail to Cribley (stating he "would like to start paying for the storage unit to take that off your plate," inquiring about the "Czymbar Loan," proposing to assemble "a memory package set" of etched knives, setting up to offer "dubs and copies" of "the tapes" and using "some of that revenue to help the cause"); 7/15/2008 e-mails to Cribley (informing Cribley that he "can start providing dubs of the show," asking her opinion as to a reasonable charge for the dubs, suggesting a price of "$19.95 plus shipping and handling," discussing digitizing the show and making a "master DVD," and offering to sell knives as well); 8/11/2008 e-mail to Attorney Witte (discussing scheduled meeting with Attorney Witte "to handle dealing with the IRS on Sherry Trost

and JoAnn Cribley's behalf," reaching a settlement with the IRS, advising that "Fred Trost left some bills"), and noting that "JoAnn also did not see payments reflected from the foundation auction and taxes that were garnished from Sherry's returns"); 8/26/2008 e-mail to Sherry Trost and Cribley (noting that "things appear quite messy, much messier than ever imagined," that Attorney Witte "indicated you may want to look at your financial situation and possibly talk to consul [sic] prior to doing anything," that the IRS will probably need to talk to the corporation's officers, and that problems with the State of Michigan will surface after resolving the IRS issues); and 9/2/2008 e-mail to Cribley (stating that he is "definitely still interested, just need to know what the IRS says").  *See* Plaintiff's Response at pp. 12-14; Copies of e-mails (docket no. 42-2 at pp. 14-40).

Shortly thereafter, the e-mails reflect a less cooperative tone between the parties.  In an e-mail to Zachary Trost dated 9/11/2008, Sherry Trost discussed Fred Trost's financial situation, stating in pertinent part:

> I know the debt your father left is considerable, but he also left enough assets to pay them off.  I would not object (and neither would Fred) to selling the tape library, his guns and other assets such as these to help pay off the debts.

*See* E-mail 9/11/2008 (docket no. 42-2 at p. 16).  In a response dated 9/16/2008, Zachary stated as follows:

> Let me know how and when you would like to "take back" the guns and video library, you also mentioned other assets so please indicated [sic] what you were referring to.  I do disagree with you on my father wanting the video library sold for reasons I stated previously.  I have spoke [sic] to the family and if you are able to determine a fair market value on the video library, the family might be interested in purchasing it.  I would like this transfer to happen soon as the storage unit is costing about $140 a month.

*See* E-mail 9/16/2008 (docket no. 42-2 at p. 15).

### F.      Kim Trost's deposition

Kim Trost testified that in 2001 and 2002 she worked for Fred Trost as a legal secretary, as "part of the law firm with Practical Sportsman [sic]."  Kim Trost Dep. at p. 9 (docket no. 42-3).  When asked if "Practical Sportsman" was a law firm, Kim responded that she worked as both an assistant for the "Practical Sportsman" television show and as a legal secretary for Fred Trost's law firm, but received her paycheck from the "Practical Sportsman."  *Id.* at pp. 9-10.  In addition to the television show, the Practical Sportsman operated a museum located in the same building, which held animal mounts and donated memorabilia.  *Id.* at pp. 11-12.  The museum closed before Fred passed away.  *Id.* at p. 13.  When asked a series of questions as to whether her husband brought home any tapes of the television show, Kim answered, "If he did, I have not seen them." *Id.* at pp. 17-18.  She was, however, aware of storage units which contained "boxes of junk."  *Id.* at p. 18.  Kim denied that she had seen any of the tapes since they were in the tape editing room at the Practical Sportsman.  *Id.* at p. 21.  Finally, Kim testified that she and Zachary never discussed Fred Trost's debts.  *Id.* at p. 22.

### G.      Kim Trost's e-mail correspondence

Plaintiff has presented copies of e-mails from Kim Trost, the contents of which reflect that Kim Trost was aware of the business debts and involved in the resolution of those debts.  In an e-mail to Cribley dated 8/12/2008, Kim Trost stated that: if the stock market had not dropped "we would be able to help out more" and "we could just pay off all the bills and everyone would be happy."  *See* E-mail 8/12/2008 (docket no. 42-2 at p. 27).

Then, in an e-mail to Cribley dated August 26, 2006, Kim Trost discussed her (and her husband's) thoughts about dealing with the IRS:

14

> [Zachary] is not throwing in the towel, but we have spoke to several people who said that if you walk into the IRS with any type of money, they are going to try to collect the entire thing.  But in your circumstance, this could be thrown out and your would not have to pay the IRS one penny or if not a lot less than what is owed (my friend owes $100,000, paying less than $7,000 to get it paid off for a business he had owned and operated).  The only problem is that they are not going to want to talk to Zach since his name is not on any of the papers so the only thing that can be done at this time is for you and Sherri to meet with them.
>
> He feels like this is all his problem .  .  .  He feels that his dad left him with this debt and he is responsible for it .  .  .
>
> I don't want you to think you are alone in this, I just want you to know Zach has to take a step back.  .  .  That is why he sent the email asking you and Sherri to go to the IRS, do whatever you have to do to get it dismissed.  After that, you guys can talk about the next plan of action.

*See* E-mail 8/26/2008 (docket no. 42-2 at pp. 26-27).  In a subsequent e-mail, Kim Trost asked to be kept informed about the IRS matter, stating in pertinent part:

> Let me know how things go, Sherry may have to be here for the IRS since her name was on the paperwork, I don't know.  I know Zach said the IRS attorneys suck but if you can get a free consultation from someone, I would do that.

*See* E-mail 8/26/2008 (docket no. 42-2 at pp. 25-26).  Then, in an e-mail to Cribley dated September 9, 2008, Kim Trost stated, "I need to stay out of what is going on, I don't want to discuss this with Zach or you since this is between both of you."  *See* E-mail 9/9/2008 (docket no. 42-2 at p. 24).

## II.    Summary Judgment standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.   Previous court orders

At the close of discovery, Zachary and Kim Trost moved for summary judgment. After the hearing on the motion, the court entered three orders addressing certain issues.

First, the court entered an order granting defendants' motion as to two of plaintiff's claims, Breach of Implied Covenants (Count II) and Statutory Conversion (Count VI). *See* Order

(docket no. 48).  The court also addressed plaintiff's request for an Injunction (Count VII),  granting the relief requested by plaintiff (as set forth in her response to the motion for summary judgment) by ordering the parties "to maintain the status quo and preserve the property at issue in this lawsuit," and enjoining all parties from "selling, transferring, destroying, disposing, injuring or otherwise causing any damage to the videotapes or other media (including but not limited to DVD's and computer hard drives)" which contain the show episodes at issue in this lawsuit.  *See* Plaintiff's Response at pp. 24-25 (docket no. 42) and Order (docket no. 48).

Second, the court entered an order striking Attorney Behan's answer filed on behalf of the "unknown" or "Doe" defendants, i.e., "John and Jane Does I-X;" "ABC Partnerships I-X;" and XYZ Corporations I-X."  *See* Order  (docket no. 49).

Third, the court dismissed the "unknown" or "Doe" defendants.  *See* Order (docket no. 50).

As a result of these orders, this lawsuit now includes two defendants (Zachary Trost and Kim Trost) and four claims: Breach of Contract (Count I); Fraud (Intentional Misrepresentation) (Count III);  Rescission (Count IV); and Common Law Conversion (Count V).

### IV.    Discussion

### A.    Breach of Contract

### 1.    Existence of the alleged oral contract

In Count I, plaintiff alleged that defendants breached an alleged oral contract.  "In Michigan, the essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja*, 187 Mich. App. 418, 422; 468 N.W.2d 58 (1991) *citing  Detroit Trust*

17

*Co. v. Struggles*, 289 Mich. 595;  286 N.W. 844 (1939).  Defendants now move for summary judgment.  Viewing the facts in the light most favorable to the non-moving party (plaintiff), sufficient evidence has been presented by plaintiff to support the existence of an oral contract for the sale of certain business assets, in which plaintiff agreed to sell Zachary Trost and his wife Kim Trost all of the property related to the show in exchange for Zachary and Kim paying the outstanding tax and loan debts related to the defunct business.  This being said, genuine issues of fact exist with respect to the terms of the contract.  In this regard, the parties have supplied little documentation regarding the corporate structure of the entities that comprised Fred Trost's business ventures or the assets owned by those entities.  The record is further complicated by Kim Trost's testimony which indicates that Fred Trost's law practice was intertwined with his other business ventures.  While record is somewhat clearer with respect to the "tax debts" and "outstanding loans" at issue in this lawsuit, the parties have submitted little documentation explaining those liabilities.

### 2.    Statute of Frauds

Assuming that the alleged oral contract existed, defendants contend that this contract is void under the statute of frauds. "The purpose of the statute of frauds is to prevent unfounded oral contract claims." *Copeland Corporation v. Choice Fabricators Inc.*, 345 Fed. Appx. 74, 77 (6th Cir. 2009).  Defendants rely on Michigan's general statute of frauds, M.C.L. § 566.132(1)(b), which states:

> In the following cases an agreement, contract or promise is void unless that agreement, contract, or promise, or a note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise:  . . .

> (b) A special promise to answer for the debt, default, or misdoings of another person.

18

M.C.L. § 566.132(1)(b).  Contrary to defendants' argument, M.C.L. § 566.132(1)(b) does not render the alleged oral contract void.

Under the alleged oral contract, Zachary Trost agreed to pay certain tax debts and loans related to the defunct business in exchange for Sherry Trost's transfer of certain business assets to him.  In *Schier, Deneweth & Parfitt, PC v. Bennett*, 206 Mich. App. 281, 282-83 520 N.W.2d 705 (1994) (a decision relied upon by defendants), the court pointed out the difference between an "original promise" and "collateral promise" in the context of a claim brought under M.C.L. § 566.132(1)(b).  In *Schier*, the court found that where the plaintiff law firm brought suit alleging that the defendant had orally agreed to pay certain legal fees incurred as a result of the plaintiff's representation of the defendant's daughter in proceedings to enforce the daughter's judgment of divorce, a promise made by the defendant to pay his daughter's legal fee was an "original promise" not a "collateral promise," and, therefore, was outside of the operation M.C.L. § 566.132(1)(b).  As the court observed in *Barbour v. Thomas*, 7 F.Supp. 271, 279 (E.D. Mich. 1933), "[i]t is well settled that the statute does not apply when the leading object of the promisor is to serve his own interest, thereby making his promise original, and not collateral."  *See, generally*, *Hillman v. Hulett*, 149 Mich. 289, 112 N.W. 918 (Mich. 1907) (where a son-in-law, on receiving a telegram addressed to his wife announcing the death of her father in a distant state, authorized the telegraph operator to have the body shipped at his expense, the promise of the son-in-law to pay for the shipment of the body and a casket in which it was shipped was an original promise, and not the promise to pay the debt of another within the statute of frauds).  Here, Zachary Trost's alleged agreement to pay certain debts was an original promise made to Sherry Trost, because it served his own interest, i.e., obtaining certain property from Sherry Trost.   Accordingly, M.C.L. §

566.132(1)(b) does not render the alleged oral contract void.  *See Barbour*, 7 F.Supp. at 279; *Hillman*, 149 Mich. 289 ; *Schier*, 206 Mich. App. at 282-83.

Furthermore, "[a] promise by the transferee of real or personal property, as the consideration for the transfer, to assume liability of the transferor, is not within the statute." *Barbour*, 7 F. Supp. at 279.  "Although an oral promise by a third party to the creditor to pay the debt of another is within the statute of frauds and must be in writing, an oral promise by a third party to the *debtor* is not within in the statute of frauds and is not required to be in writing." *Gruppuso v. Faraci*, No. 220993, 2001 WL 699938 at *2 (Mich. App. March 27, 2001) (emphasis added), citing *Pratt v. Bates*, 40 Mich. 37, 39-40 (1879) (a promise to pay a debt made directly to the debtor for consideration is not within the statute of frauds).  *See also, In re Estate of Kassab*, No. 259597, 2006 WL 1867144 at *2 (Mich. App. July 6, 2006) (a promise to pay a debt made directly to the debtor for consideration is not a promise to pay the debt "of another" subject to M.C.L. § 566.132(1)(b)).

Viewing the facts in the light most favorable to plaintiff, defendants' claim that the alleged oral contract is barred by M.C.L. § 566.132(1)(b) fails.  Accordingly, defendants' motion for summary judgment of the breach of contract claim alleged in Count I will be denied.[6]

### B.      Fraud (Intentional Misrepresentation)

Defendants seek summary judgment on plaintiff's claim of fraud and intentional misrepresentation alleged in Count III.  The Sixth Circuit set forth the elements of Michigan

---

[6]Whether the alleged oral contract may be subject to the statute of frauds provision in Michigan's version of the Uniform Commercial Code, M.C.L. § 440.2201, which applies to the sales of goods, because the contract involved the sale of tapes, memorabilia, knives and other personal property has not been briefed by either party, and will not be addressed by the court.

common law fraud and intentional misrepresentation in *Bennett v. MIS Corporation*, 607 F.3d 1076

(6th Cir. 2010):

> Under Michigan law, common-law fraud requires proof that:
>
>> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.
>
> *Cummins v. Robinson Twp.*, 283 Mich.App. 677, 770 N.W.2d 421, 435 (2009). Further, an action for fraud must be predicated upon a false statement relating to a past or existing fact; promises regarding the future are contractual and do not support a claim for fraud. *See Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813, 815 (1976). In addition, establishing a claim of fraudulent misrepresentation requires the plaintiff's reasonable reliance upon the false representation. *Cummins*, 770 N.W.2d at 435.

*Bennett*, 607 F.3d at 1100-01.

As a general rule, "[s]tatements promissory in their character that one will do a particular thing in the future are not misrepresentations, but are contractual in their nature, and do not constitute fraud." *Boston Piano & Music Co. v. Pontiac Clothing Co.*, 199 Mich. 141, 147, 165 N.W. 856 (1917). However, the Michigan Supreme Court recognizes a "bad faith" exception to the general rule that promises are not actionable torts. *Hi-Way Motor Co.*, 398 Mich. at 337-39. Under this exception, "a fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Id.*, citing *Crowley v. Langdon*, 127 Mich. 51, 58-59, 86 N.W. 391 (1901). To come within the bad faith exception, "evidence of fraudulent intent . . . must relate to conduct of the actor at the very time of making the representations, or almost immediately thereafter." *Hi-Way Motor Co.*, 398 Mich. at 338-39 (internal quotation marks omitted).

Viewing the evidence in the light most favorable to plaintiff, the court concludes that plaintiff has presented sufficient evidence to support a cause of action for common law fraud under the bad faith exception. *See Hi-Way Motor Co.*, 398 Mich. at 337-39. In her response to the motion for summary judgment, plaintiff characterized the false misrepresentation as follows, "[a]t trial, Plaintiff, JoAnn Cribley and numerous other witnesses will testify that the Defendant [Zachary Trost] knowingly or recklessly materially misrepresented to Plaintiff that he would pay her as detailed above if she would give him all the property she owned related to the shows." Plaintiff's Response at p. 18 (docket no. 42). Plaintiff's theory appears to be that Zachary Trost made a false material misrepresentation as to future conduct, because he had no intention of paying for the tapes. Zachary Trost's own deposition testimony regarding his use of the tapes supports this theory. For example, Zachary testified that the tapes had little value; that the tapes were "[m]ore of a liability" due to the storage costs; that he threw away "a couple thousand tapes;" and that he kept only about "a couple hundred" at his house. Zachary Trost Dep. at pp. 30-40. Viewed in the light most favorable to plaintiff, the evidence (including Zachary's testimony) support plaintiff's theory that Zachary had no intention of paying $108,797.06 for tapes, items which he considered to be of such little value that he threw the vast majority of them in the garbage and characterized as not worth the cost of storing. Accordingly, defendants' motion for summary judgment shall be denied as to plaintiff's claim for fraud alleged in Count III.

### C.     Rescission

In Count IV, plaintiff seeks to rescind the contract entered into with defendant. Plaintiff contends that she is entitled to rescission due to defendants deceit (i.e., fraud) and a material and substantial breach of the contract. Plaintiff's Response at p. 17. Rescission is an equitable

remedy by which a party repudiates and prevents enforcement of a contract. *SG P Enterprises, Inc. v. Jackson National Life Insurance Company*, 202 Mich. App. 557, 566, 509 N.W.2d 780 (1993).

> To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning; that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract, but to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made. Rescission necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. But this by itself would constitute no more than a breach of the contract or a refusal of performance, while the idea of rescission involves the additional and distinguishing element of a restoration of the status quo.

*Wall v. Zynda*, 283 Mich. 260, 264, 278 N.W. 66, 68 (1938), quoting 1 *Black on Rescission and Cancellation*, § 1.

Grounds for rescission include a breach of a substantial part of the contract, unconscionable conduct, fraud or mistake. *O'Conner v. Bamm*, 335 Mich. 438, 444, 56 N.W. 2d 250 (1953).[7] Rescission is permissible when there has been a failure to perform a substantial part of the contract or one of its essential items, or where the contract would not have been made if default in that particular part of the contract had been expected or contemplated. *Id.* For purposes of rescission, "[a] contractual mistake is a belief that is not in accord with the facts." *Lenawee County Board of Health v. Messerly*, 417 Mich. 17, 24, 331 N.W.2d 203 (1982) (internal quotation omitted). To constitute a contractual mistake, "[t]he erroneous belief of one or both of the parties must relate to a fact in existence at the time the contract is executed." *Id.*

---

[7] The court notes that other Michigan Supreme Court decisions require mistake or fraud before allowing a party to rescind a contract. *See, e.g., Ferd L. Alpert Industries, Inc. v. Oakland Metal Stamping Co.*, 379 Mich. 272, 276, 150 N.W.2d 765 (1967) (fraud or mistake are "essential elements" of a cause of action for rescission, reformation or cancellation); *Windham v. Morris*, 370 Mich. 188, 193, 121 N.W.2d 479 (1963) ("[g]enerally, rescission of a contract will not lie except for mutual mistake or unilateral mistake induced by fraud").

"Under Michigan law, the party seeking rescission of a contract must prove three elements: (1) a seasonable assertion of the rescission right; (2) tender of the consideration and benefits received; and, (3) demand for repayment of any price paid." *Two Men and a Truck/International Inc. v. Two Men and a Truck/Kalamazoo, Inc.*, 949 F.Supp. 500, 507 (W.D. Mich.1996), citing *Mesh v. Citrin*, 299 Mich. 527, 300 N.W. 870, 872 (1941). "The party seeking rescission must first return the other party to the pre-contract status quo, and rescission is not available to a party who has failed to make payments required by a contract and is thus in default." *Two Men and a Truck/International Inc.*, 949 F.Supp. at 507 (W.D. Mich.1996) (citations omitted).

As previously discussed, for purposes of this summary judgment motion, plaintiff has established the existence of fraud with respect to the contract. Accordingly, she can seek rescission of the contract on this basis. In addition, viewing the facts in the light most favorable to plaintiff, a reasonable jury could conclude that a mistake occurred during the formation of the contract or that defendant failed to perform a substantial part of the contract. *See* discussion in §§ I.B, C, D, E, F and G, *supra*. Accordingly, defendants' motion for summary judgment shall be denied as to plaintiff's claim for rescission alleged in Count IV.

### D. Common Law Conversion

Finally, in addition to seeking remedies related to the alleged breach of contract, plaintiff's Count V seeks relief against defendants for the tort of common law conversion. "In the civil context, conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391, 486 N.W.2d 600 (1992). "In general, it is viewed as an intentional tort in the sense that the converter's actions are wilful, although the tort can be committed unwittingly

if unaware of the plaintiff's outstanding property interest." *Id.* A person may commit a conversion

by:

> (a) intentionally dispossessing another of a chattel, (b) intentionally destroying or altering a chattel in the actor's possession, (c) using a chattel in the actor's possession without authority so to use it, (d) receiving a chattel pursuant to a sale, lease, pledge, gift or other transaction intending to acquire for himself or for another a proprietary interest in it, (e) disposing of a chattel by a sale, lease, pledge, gift or other transaction intending to transfer a proprietary interest in it, (f) misdelivering a chattel, or (g) refusing to surrender a chattel on demand.

*Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 438, 104 N.W.2d 360 (1960) (quoting

*Restatement (First) of Torts* § 223). However, liability for the conversion does not arise if the actor

is privileged to dispose of the chattel. *Id.*

It is possible for a party's conduct to result in both a breach of contract and a tort for

common law conversion.

> Under Michigan law, a party's actions may give rise to an action for breach of contract as well as an action in tort. *Hart v. Ludwig*, 347 Mich. 559, 562, 79 N.W.2d 895, 806-97 (1956). Whether a tort action may be maintained when the claim is based upon a contractual obligation depends upon whether the defendant's conduct constituted a breach of duty separate and distinct from the breach of contract. *Haas v. Montgomery Ward & Co.*, 812 F.2d 1015, 1016 (6th Cir.1987); *Brewster v. Martin Marietta Aluminum Sales, Inc.*, 145 Mich.App. 641, 667-68, 378 N.W.2d 558, 568 (1985). In other words, if a legal duty could not be enforced in the absence of the contract, a tort action may not be maintained. *Brewster*, 145 Mich.App. at 667, 378 N.W.2d at 569. Thus, "[t]he question is whether the tort action would arise independent of the existence of the contract." *Allendale Mut. Ins. Co. v. Triple-S Techs., Inc.*, 851 F.Supp. 277, 280 (W.D. Mich.1993).

*Wrench LLC v. Taco Bell Corp.*, No. 1:98-cv-45, 2003 WL 21653410 at *1 (W.D. Mich. May 1,

2003).

Here, genuine issues of material fact exist with respect to whether Zachary Trost

committed a civil common law conversion by wrongfully exerting a distinct act of domain over

Sherry Trost's property inconsistent with her rights. Assuming, for example, that Sherry Trost

owned the tapes, and the parties did not have a contract allowing Zachary to possess them, Zachary's refusal to return the tapes on her demand or his destruction of the tapes could constitute a civil conversion of the affected property. *See Foremost Ins. Co.*, 439 Mich. at 391; *Thoma*, 360 Mich. at 438. Accordingly, defendants' motion for summary judgment will be denied with respect to plaintiff's claim for common law conversion alleged in Count V.

## V.      Conclusion

For reasons stated above, defendants' motion for summary judgment (docket no. 33) will be **DENIED**. An order consistent with this opinion shall be issued forthwith.


Dated:  September 28, 2011                          /s/ Hugh W. Brenneman, Jr.
                                                    HUGH W. BRENNEMAN, JR.
                                                    United States Magistrate Judge

26